## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| SHAWN O'BRIEN, | CASE NO. 5:21-CV-00506-AMK |
| Plaintiff, | |
| vs. | AMANDA M. KNAPP<br>UNITED STATES MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff Shawn O'Brien ("Plaintiff" or "Mr. O'Brien") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). (ECF Doc. 1.) This matter is before this Court by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF Doc. 18.)

For the reasons set forth below, the final decision of the Commissioner is **VACATED** and **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ should: (1) set forth specific reasons for the weight given to Mr. O'Brien's symptoms; (2) ensure that those reasons are consistent with and supported by the evidence; and (3) clearly articulate the reasons given so that others can assess how the ALJ evaluated Mr. O'Brien's symptoms.

1

## I. Procedural History

On September 7, 2018, Mr. O'Brien filed an application for DIB. (Tr. 65.) He alleged a disability onset date of April 22, 2018. (Tr. 66.) He alleged disability due to back injury, neck injury, arthritis, limb numbness, chronic migraines, mental issues, knee pain, social anxiety, inability to sit or stand for long periods, and possibly depression, PTSD, or ADHD. (*Id.*) Mr. O'Brien's application was denied at the initial level (Tr. 81) and upon reconsideration (Tr. 98), and he requested a hearing (Tr. 111). On June 11, 2020, a hearing was held before an Administrative Law Judge ("ALJ"). (Tr. 27-64.)

On August 12, 2020, the ALJ issued a decision finding that Mr. O'Brien had not been under a disability within the meaning of the Social Security Act from April 22, 2018 through the date of the decision. (Tr. 9-22.) On January 5, 2021, the Appeals Council denied Mr. O'Brien's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

On March 3, 2021, Mr. O'Brien filed a Complaint challenging the Commissioner's final decision. (ECF Doc. 1.) The parties have completed briefing in the case. (ECF Docs. 14, 16.)

## II. Evidence

**A.  Personal, Educational, and Vocational Evidence**

Mr. O'Brien was born in 1979, and was a younger individual under Social Security regulations at all relevant times. (Tr. 21.) He had at least a high school education. (*Id.*) Mr. O'Brien had not worked since April 22, 2018, the alleged onset date. (Tr. 14.)

**B.  Medical Evidence**

Although Mr. O'Brien has mental impairments that were identified by the ALJ (*id.*), he only challenges the ALJ's decision regarding his physical impairments. (ECF Doc. 14.) The evidence summarized herein is accordingly focused on the evidence pertaining to his physical

2

impairments. *Kennedy v. Comm'r of Soc. Sec.*, 87 Fed.App'x. 464, 466 (6th Cir. 2003) (unbriefed "issues which are 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996).)

### 1. Treatment History

On October 30, 2012, Mr. O'Brien underwent a C5-6 anterior cervical decompression, fusion, and plating to address disc herniation, spondylosis, stenosis, cervical myelopathy, and intractable cervical spine pain and radiculopathy. (Tr. 578-79.) A cervical MRI dated January 28, 2013 reflected that he was status-post anterior fusion at C5- C6 without recurrent disc herniation or canal stenosis, but with mild diffuse annular disc bulging remaining at C6-C7, similar in appearance to a previous exam. (Tr. 652-53.) An MRI of his lumbar spine dated February 7, 2013 showed minimal degenerative changes but no stenosis. (Tr. 658.)

On March 2, 2018, Mr. O'Brien attended a consultation with George Markarian, M.D. at the Center for Neuro and Spine, complaining of worsening moderate-severe back and neck pain, which radiated into both arms with numbness, tingling and weakness. (Tr. 351.) Dr. Markarian noted a history of anterior cervical fusion in 2012, and that Mr. O'Brien had most recently been seen at the Center for Neuro and Spine in September 2017. (*Id*.) Dr. Markarian assessed him with symptomatic cervical radiculopathy and ordered a cervical CT scan and MRI. (Tr. 351-52.)

In counseling notes dated September 9, 2018, Mr. O'Brien reported that he had tried to work under the table but was unable to do so because of back pain, and was considering applying for disability. (Tr. 398.) He also reportedly applied for jobs that would let him work from home, but said he lacked the necessary skills and qualifications for those jobs. (*Id*.) He explained he had lost his truck driving job due to a motor vehicle accident where he had been drinking and his girlfriend grabbed the wheel. (Tr. 399.) He noted that "driving is something he's good at, can

do, and enjoys," but indicated he could not afford to pay the fines and costs required to regain his license. (*Id*.) In November 2018, he reported looking for computer-based work. (Tr. 407.)

Mr. O'Brien saw primary care provider J. David Stokes, Jr., M.D. on November 12, 2018, January 8, 2019, and February 7, 2019 for chronic pain in the neck and thoracic areas. (Tr. 348, 415, 418.) In November 2018, Mr. O'Brien denied gait abnormality, and Dr. Stokes noted that his gross muscle strength was intact. (Tr. 348-49.) In January 2019, he reported that he had new x-rays that "showed disks chipping." (Tr. 415.) At each appointment, Dr. Stokes noted that Mr. O'Brien's chronic pain was "stable, at patient's baseline," and that he was "doing well and without complaints." (Tr. 348-49, 415, 418-20.) On examination, his back was reported to be "unremarkable" with "no CVA tenderness." (Tr. 348-49, 415-16, 418-20.) Dr. Stokes continued Mr. O'Brien's prescriptions for Percocet and ibuprofen at each visit. (Tr. 350, 506-07, 420.)

On May 8, 2019, Mr. O'Brien underwent MR imaging of his cervical, thoracic, and lumbar spine. (Tr. 886-92.) The cervical MRI showed multilevel cervical spondylosis, most prominent at C6-C7, severe foraminal narrowing at C3-C4 due to disc protrusions and spurring, and postoperative changes of anterior cervical fusion at C5- C6. (Tr. 891-92.) The thoracic MRI showed multilevel degenerative changes with multilevel disc bulging with contact and flattening of segments of the underlining cord involving the T7-T8 through T10-T11 levels, as well as a disc protrusion contributing to significant foraminal narrowing at T5-T6. (Tr. 888-90.) The lumbar MRI showed multilevel lumbar degenerative changes, moderate left-sided foraminal stenosis at L5, and left-sided narrowing at L1-L2. (Tr. 886-88.)

A CT was then taken of Mr. O'Brien's cervical spine on June 6, 2019. (Tr. 907-09.) At the C3-C4 level, the imaging showed left foraminal stenosis related to posterior lateral endplate osteophyte formation impinging on the neural foramina and flattening the left ventral aspect of

4

the thecal sac, as well as a small broad-based disc protrusion. (*Id.*) At the C6-C7 level, the imaging showed degenerative disc and endplate changes with moderate canal stenosis and moderate bilateral foraminal stenosis. (Tr. 909.) At the C5-C6 level, Mr. O'Brien was status-post anterior fusion with intact hardware, but with disc space narrowing appearing more pronounced in comparison to the prior 2013 CT examination. (*Id.*)

Mr. O'Brien was admitted to Akron City Hospital on December 2, 2019 for a posterior cervical decompression and fusion at C5-C7 to address his radiculopathy of the cervical spine. (Tr. 1009.) Notes indicate a history of excision of lamina of cervical vertebra for decompression of his spinal cord, and pseudoarthritis following a prior spinal fusion. (*Id.*) Ryan Godinsky, M.D., noted "[s]ignificant cervical degeneration was identified which was operated on secondary to a combination of significant disc space collapse, osteophyte formation, as well as ligamentum flavum thickening and uncovertebral hypertrophy contributing to spinal stenosis." (Tr. 1027.) Mr. O'Brien reportedly elected to proceed with surgery because his symptoms had not improved with conservative management. (*Id.*) He was discharged on December 4, 2019 in stable condition, with instructions to follow up in two or three weeks. (Tr. 1009, 1011.)

Mr. O'Brien attended a primary care appointment with Elizabeth Whipkey, M.D., at Barberton Family Practice on January 16, 2020. (Tr. 993.) With respect to his recent surgery, Dr. Whipkey noted he was recovering well, but was not allowed to lift his arm over his head and should start physical therapy soon. (*Id.*) Dr. Whipkey also addressed Mr. O'Brien's complaint of acute onset left shoulder pain, beginning the prior November. (*Id.*) She noted that it was initially unclear whether it was a new problem, like a rotator cuff injury, or a worsening of his cervical radiculopathy. (*Id.*) He was given steroids and referred to physical therapy ("PT") and an orthopedic doctor. (*Id.*) He reported some improvement with two sessions of PT, but no

5

benefit from the steroids.  (*Id.*)  He had not yet followed up with an orthopedist for his shoulder due to his neck surgery and reported that his shoulder symptoms initially improved but had worsened in the past few weeks.  (*Id*.)  On examination, Mr. O'Brien demonstrated pain and a restricted range of motion in the left shoulder due to the recent surgery, and his left arm was "[n]oticeably weaker" with 4/5 strength with external rotation.  (Tr. 995.)  Dr. Whipkey suspected a rotator cuff injury and recommended that Mr. O'Brien see an orthopedist.  (Tr. 996.)

      2.      **Opinion Evidence**

           i.      **Consultative Examination**

Mr. O'Brien was examined by Mark Vogelgesang, M.D. on January 2, 2019 at the request of the Social Security Administration.  (Tr. 353-57.)  Mr. O'Brien described his cervical spine pain as 5 or 6 out of 10 and his low back pain as 7 out of 10, with right leg pain.  (Tr. 354.)  He described difficulty standing, walking for long distances, or carrying a backpack due to pain, but did not use a mobility device.  (*Id*.)  He reported he could walk half a mile to a mile, sit for an hour if he shifted positions, carry and lift 30 pounds, and stand for about an hour, but noted that his right leg would go numb.  (*Id*.)  On examination, Mr. O'Brien was noted to be obese with elevated blood pressure.  (Tr. 355.)  He had no difficulty getting onto the examination table.  (*Id*.)  He had no tenderness on palpation to the spine, but he had decreased extension, right lateral flexion and right lateral rotation.  (*Id*.)  He had a good range of motion in all joints with full strength, walked without a limp, and was able to touch his toes.  (Tr. 355-56.)  Dr. Vogelgesang opined that Mr. O'Brien "could probably tolerate moderate to light to sedentary work."  (Tr. 356.)  He also indicated that Mr. O'Brien "may need to rest periodically during the day because he is in poor condition," and "may also have to avoid doing extensive bending or twisting because of his history of having low back and thoracic spine pain."  (*Id*.)

6

## ii. Report of Medical Provider

In a letter dated May 25, 2020, Dr. Elizabeth Whipkey of Barberton Family Practice wrote that Mr. O'Brien was seen in her clinic on January 16, 2020, and had chronic neck pain with radiculopathy, spinal stenosis, and shoulder pain of uncertain etiology. (Tr. 992.) She opined that it was reasonable for him to be evaluated for disability benefits, and recommended a thorough capacity evaluation by physical therapy. (*Id.*)

## iii. Function Reports

Mr. O'Brien completed a Function Report in November 2018. (Tr. 250-57.) He reported that he was unable to work because of absences related to his neck and back pain and an "extremely short temper" related to his social anxiety disorder. (Tr. 250.) With regard to activities of daily living, he reported that he helped watch his girlfriend's daughter while she worked, including getting her ready for school in the mornings, did the dishes, and helped make dinner at times. (Tr. 251.) He also fed, watered, and changed litter boxes for two cats, but noted that his girlfriend sometimes changed the litter boxes. (*Id.*) He reported that he had difficulty bending to put on socks and shoes and bathe, but he was occasionally able to prepare complete meals, mow the grass, wash clothes, and clean. (Tr. 251-52.) Mr. O'Brien also stated he shopped for food once or twice a month with his girlfriend, but did his other shopping online to avoid people. (Tr. 253.) He stated that he enjoyed watching television, movies, and playing board games as well as going to church, but kept to himself. (Tr. 254.)

He reported that he needed something to hold onto before bending or kneeling, but otherwise did not need assistance to ambulate. (Tr. 255.) He explained:

> My strength is gone for the most part, and I get no real sleep without pain. Even sitting hurts, I am in constant pain. But I'm only 39 and it seems no one believes me or wants to help me. I'm far from lazy and would be working if a job understood I need a few days off a couple of times a month cause my back hurts.

7

(Tr. 257.)

### iv. State Agency Reviewers

On January 30, 2019, state agency reviewing physician Gary Hinzman, M.D., reviewed the record and opined that Mr. O'Brien could perform medium work, with the following additional physical functional limitations:

- occasionally climbing ladders, ropes, or scaffolds; and
- frequently climbing ramps or stairs, stooping, kneeling, crouching, and crawling.

(Tr. 74-75.) On March 22, 2019, state agency reviewing physician Elizabeth Das, M.D., reviewed the record and concurred with the earlier opinion of Dr. Hinzman. (Tr. 91-92.)

## C. Hearing Testimony

### 1. Plaintiff's Testimony

At the June 11, 2020 hearing, Mr. O'Brien testified that he lived with his mother, his grandmother, his girlfriend, and his girlfriend's seven-year-old daughter, as well as two cats and his mom's dog. (Tr. 33.) He testified that he didn't sleep much due to pain, would ordinarily wake around four or five in the morning, and took naps during the day. (Tr. 44.) He cared for his girlfriend's daughter while her mother worked. (Tr. 45.) He explained that although the child had a lot of energy, he mostly listened to her talk, made her lunch, and watched her play games. (*Id.*) He did chores that included washing dishes, folding clothes, and vacuuming once in a while. (Tr. 46.) He worked for about 20 minutes at a time and took rest breaks, and his back hurt the whole time he did chores. (Tr. 48-50.) He did yardwork like mowing the lawn with a push mower, but he reported that he used to mow it in a couple of hours, but that it then took him four or five hours to mow because he had to take breaks every five to ten minutes. (Tr. 50-51.) He liked to cook and grill but did not do it often anymore because it took longer due to his back

8

pain. (Tr. 52.) He stopped fishing two or three years prior, and when he went in the swimming pool he just floated. (*Id.*) When he sat down to watch a tv show, he testified that he would constantly move or fidget because his back hurt. (Tr. 53-54.) Twice during an hour-long show, he said he would have to get up and stretch. (*Id.*) He reported sometimes using a cane at the grocery store and inside his home. (Tr. 55-56.)

In discussing his prior work, Mr. O'Brien noted that he had quit a number of jobs because his back hurt too much to continue working. (Tr. 42.) He testified that his last jobs all involved lifting heavy items, and reported that he could not get hired for jobs that did not require heavy labor. (Tr. 42-43.)

Mr. O'Brien testified he wasn't sure if his back surgery six months prior, in December 2019, had helped his pain or numbness. (Tr. 43.) He reported that he had an upcoming appointment with an orthopedist, and was supposed to be assessed for physical therapy. (Tr. 44.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified. (Tr. 56.) The VE testified that a hypothetical individual of Mr. O'Brien's age, education, and work experience, and the functional limitations described in the ALJ's residual functional capacity ("RFC") determination could perform representative positions in the national economy, including mail clerk, electronics worker, and inspector/hand packager. (Tr. 58-60.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

9

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her August 12, 2020 decision, the ALJ made the following findings:[1]

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2022. (Tr. 14.)

2. The claimant has not engaged in substantial gainful activity since April 22, 2018, the alleged onset date. (*Id.*)

3. The claimant has the following severe impairments: spinal stenosis and radiculopathy with pain in the cervical, thoracic, and lumbar spine – status post two spinal surgeries, osteoarthritis, obesity, mood disorder, and anxiety disorder. (*Id.*)

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15.)

5. The claimant has the residual functional capacity to perform light work with occasionally lifting and carrying up to 20 pounds and frequently lifting and carrying 10 pounds; sitting for 6 hours in an 8-hour workday; standing/walking for 6 hours in an 8-hour workday; pushing and pulling as much as he can lift and carry; never climbing ladders, ropes, and scaffolds; frequently climbing of ramps and stairs; frequently stooping, kneeling, crouching, and crawling; limited to the performance of simple, routine tasks; can tolerate few changes in a routine work setting; and requires a sit/stand option that would allow five minutes of sitting for every 30 minutes of standing, followed by standing again. (Tr. 16-17.)

6. The claimant is unable to perform any past relevant work. (Tr. 20.)

7. The claimant was born in 1979 and was 38 years old, defined as a younger individual age 18-49, on the alleged disability onset date. (Tr. 21.)

8. The claimant has at least a high school education. (*Id.*)

9. Transferability of job skills is not material to the determination of disability. (*Id.*)

---

[1] The ALJ's findings are summarized.

11

> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including mail clerk, electronics worker, and inspector/hand packager. (*Id.*)

Based on the foregoing, the ALJ determined that Mr. O'Brien had not been under a disability, as defined in the Social Security Act, from April 22, 2018 through the date of the decision on August 12, 2020. (Tr. 22.)

### V. Plaintiff's Arguments

Mr. O'Brien raises a single assignment of error: that the ALJ's finding that he can perform and sustain light work is not supported by substantial evidence because the ALJ failed to properly analyze his reports of symptoms pursuant to SSR 16-3p. (ECF Doc. 14 pp. 1, 8.)

### VI. Law & Analysis

**A.     Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)); *see also Blakley*, 581 F.3d at 406. The Commissioner's findings "as to

12

any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

"Generally, . . . we review decisions of administrative agencies for harmless error." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). But even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651(quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.     Whether ALJ Erred in Evaluating Mr. O'Brien's Subjective Symptoms**

In support of his sole assignment of error, Mr. O'Brien contends that the ALJ "d[id] not sufficiently articulate how she evaluated [Mr. O'Brien]'s symptoms pursuant to 16-3p," and "failed to account for most of the factors set forth" in SRR 16-3p.  (ECF Doc. 14 p. 8.)  The ALJ provided the following analysis to support her findings regarding Mr. O'Brien's symptoms:

> The claimant's allegations are determined to be less than fully consistent with the evidence. <u>The nature and degree of pain and functional limitations alleged by the claimant is not supported by medical and non-medical sources. Diagnostic test results and physical examination findings have been largely unremarkable</u>. For example, a physical examination performed in 2019 revealed that the claimant was alert and oriented to all spheres, an examination of the back was unremarkable, and there was no costovertebral angle (CVA) tenderness present (Exhibit B6F, pg. 2). Moreover, the claimant engages in a variety of daily activities that indicate a greater level of functioning than alleged. For example, he testified that on a typical day, he completes household chores such as washing dishes or organizing his drawer, occasionally goes grocery shopping, cooks on his grill once to twice per month, and watches his girlfriend's seven-year-old child while she is at work (hearing testimony).

(Tr. 19 (emphasis added).)  Prior to making these findings, the ALJ had described the medical records relating to Mr. O'Brien's back impairments as follows:

> The claimant has a history of spinal stenosis and radiculopathy with pain in the cervical, thoracic, and lumbar spine – status post two spinal surgeries, osteoarthritis, and obesity. In January of 2019, he presented to Dr. Stokes for a follow up visit regarding chronic neck and back pain. According to the claimant, he was currently doing well without complaints, and his pain was well controlled by his medications (Exhibit B6F, pg. 1). <u>A physical examination performed at this time revealed that the claimant was alert and oriented to all spheres, an examination of the back was unremarkable, and there was no costovertebral angle (CVA) tenderness present</u>. Based on these findings, Dr. Stokes diagnosed the claimant with chronic pain, spinal stenosis of the cervical and thoracic region, osteoarthritis, and generalized anxiety disorder. In addition, Dr. Stokes advised the claimant to continue taking his medications as prescribed, including Percocet (Exhibit B6F, pg. 2). <u>In May of 2019, the claimant obtained an MRI of the lumbar spine based on a history of radiculopathy of the lumbar spine (Exhibit B7F, pg. 465). This study revealed multilevel lumbar degenerative changes, there was moderate leftsided foraminal stenosis at the L4/5 level, and there was mild to moderate left-sided narrowing at the L1/2 level</u> (Exhibit B7F, pg. 467). <u>The claimant obtained an MRI of the cervical spine in June of 2019 based on a history of a cervical fusion surgery, which revealed left foraminal stenosis at the C3/4 level related to posterior endplate osteophyte</u>

14

> formation that impinged on the neural foramina and flattened the left ventral aspect of the thecal sac, along with a small, broadbased disc protrusion at that level. In addition, there were degenerative disc and endplate changes at the C6/7 level, with moderate canal stenosis and bilateral foraminal stenosis, and status post anterior fusion at the C5/6 level (Exhibit B7F, pg. 488).

(Tr. 17-18 (emphasis added.)

Mr. O'Brien argues that the ALJ failed to properly analyze his subjective complaints under SSR 16-3p when she neglected to explain why she did not find that his significant spinal imagery corroborated his alleged "symptoms of chronic pain and functional limitations." (*Id.* at p. 9.)  "By failing to cohesively set forth her reasoning with support from the record," Mr. O'Brien argues the ALJ ultimately failed to "clearly articulate how she evaluated [Mr. O'Brien]'s daily living activities, chronic pain, recent history of surgery, and the other relevant factors when evaluating [Mr. O'Brien]'s subjective complaints." (*Id.* at p. 13.)  The Commissioner responds that the ALJ followed the regulations in evaluating Mr. O'Brien's subjective symptoms (ECF Doc. 16 pp. 7-8) and properly resolved all conflicts in the testimony and evidence (*id*. at pp. 10-11).  She asserts that the ALJ's RFC determination is supported by substantial evidence, and therefore entitled to deference from this Court. (*Id*. at p. 6.)

When addressing allegations regarding a claimant's subjective symptoms, SSR 16-3p provides that the ALJ's decision should "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 81 Fed. Reg. 14166, 14171 (March 16, 2016). That determination should focus on whether the claimant's "statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record . . ." SSR 16-3p, 81 Fed. Reg. 14166, 14170.

15

Nevertheless, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also* 20 C.F.R. § 404.1529(a) (noting evaluation of symptoms is now based on "the extent to which . . . alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as *consistent* with the medical signs and laboratory findings and other evidence") (emphasis added); SSR 16-3p, 81 Fed. Reg. 14166, 14167 (eliminating term "credibility" from SSA's sub-regulatory policy and replacing it with "consistency" in keeping with revised regulations). Ultimately, the ALJ's assessment of the consistency of a claimant's subjective complaints with the evidence "must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

As noted above, "[s]ubstantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030. Although the substantial evidence standard is largely deferential, the Sixth Circuit has emphasized that the chief limitation to that deference "is the requirement that all determinations be made based upon the record in its entirety." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007) (citing *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984)). The court explained: "This requirement that determinations be made in light of the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history." *Rogers*, 486 F.3d at 249. In applying the substantial evidence standard, it must also be

16

considered whether the reasoning given fails to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

Here, the ALJ supplied two general reasons for concluding that the nature and degree of pain and functional limitation that Mr. O'Brien alleged was not supported by medical or non-medical sources: (1) "[d]iagnostic test results and physical examination findings have been largely unremarkable"; and (2) "the claimant engages in a variety of daily activities that indicate a greater level of functioning than alleged." (Tr. 19.)  Mr. O'Brien's challenge focuses on the first reason, the ALJ's contention that his diagnostic test results and physical examination findings "have been largely unremarkable."  The undersigned agrees with Mr. O'Brien that this characterization is not consistent with the medical record as a whole, which contains spinal imagery with findings that are not appropriately characterized as "unremarkable" and evidence that those findings were significant enough to warrant a new spinal surgery.

As an initial matter, it is noted that the ALJ accurately characterized the physical examination findings of Mr. O'Brien's primary care provider in January 2019 as "largely unremarkable."  (Tr. 17-19.)  The ALJ also provided an accurate summary of the May and June 2019 MRI findings earlier in her decision, and noted Mr. O'Brien's self-report of recent spinal surgery.  (Tr. 17-18.)  Nevertheless, her finding that his subjective complaints were not consistent with medical sources because his diagnostic test results and physical examination findings were "largely unremarkable" – as supported by normal findings at an office visit that preceded Mr. O'Brien's MRI results by five months and his spinal surgery by nearly a year – is at odds with the requirement in SSR 16-3p that the ALJ's decision "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence,

17

and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 81 Fed. Reg. 14166, 14171.

The results of the MRI and CT imaging of Mr. O'Brien's spine taken in spring 2019 cannot be accurately characterized as "largely unremarkable." Both thoracic and lumbar MRIs showed multilevel degenerative changes. (Tr. 886-90.) Cervical, thoracic and lumbar MRIs showed foraminal narrowing, and the cervical MRI showed postoperative changes of anterior cervical fusion. (Tr. 886-92.) CT imaging completed in June 2019 showed left foraminal stenosis related to posterior lateral endplate osteophyte formation impinging on the neural foramina and flattening the left ventral aspect of the thecal sac, as well as a small broad-based disc protrusion, degenerative disc and endplate changes with moderate canal stenosis, moderate bilateral foraminal stenosis, and increased disc space narrowing in comparison to prior imaging. (Tr. 907-09.)

Following that significant imagery, Mr. O'Brien underwent a posterior cervical decompression and fusion at C5-C7 to treat radiculopathy of the cervical spine in December 2019. (Tr. 17, 1009.) His surgeon noted "[s]ignificant cervical degeneration . . . which was operated on secondary to a combination of significant disc space collapse, osteophyte formation, as well as ligamentum flavum thickening and uncovertebral hypertrophy contributing to spinal stenosis." (Tr. 1027 (emphasis added).) He also noted that Mr. O'Brien's "clinical exam has been consistent with significant neck pain and upper extremity radiculopathy" which had not improved with conservative management. (*Id*. (emphasis added).) At a follow-up examination with a family practice physician in January 2020, Mr. O'Brien demonstrated pain and a restricted range of motion in the left shoulder, and his left arm was "[n]oticeably weaker" with 4/5 strength with external rotation. (Tr. 994-95.)

Although the ALJ decision did detail Mr. O'Brien's spinal imagery findings and mention his reports of a recent surgery in the earlier discussion, her stated conclusion that Mr. O'Brien's subjective complaints are not consistent with the objective medical evidence of record because that objective evidence was "largely unremarkable" is not consistent with the medical records as a whole because it fails to acknowledge or account for the objective findings in Mr. O'Brien's spinal imagery and surgical records that are by no means "unremarkable."  Because the reasons given by the ALJ to support her findings as to Mr. O'Brien's subjective complaints were not consistent with the objective medical evidence as a whole, and because she failed to clearly articulate the impact of Mr. O'Brien's spinal imagery and surgical records on those findings, the undersigned finds that the ALJ's findings under SSR 16-3p are not supported by substantial evidence and fail to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 77f F. Supp. 2d at 877.  Accordingly, the decision must be remanded to allow the ALJ to more fully explain the basis for her assessment of Mr. O'Brien's subjective allegations.

## VII. Conclusion

For the foregoing reasons, the final decision of the Commissioner is **VACATED** and **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Memorandum Opinion and Order.  On remand, the ALJ should: (1) set forth specific reasons for the weight given to Mr. O'Brien's symptoms; (2) ensure that those reasons are consistent with and supported by the evidence; and (3) clearly articulate the reasons given so that others can assess how the ALJ evaluated Mr. O'Brien's symptoms.

September 29, 2022

/s/Amanda M. Knapp

AMANDA M. KNAPP
United States Magistrate Judge